WILLIAM GUAGLIARDO, Appellant, *v.* FORD MOTOR COMPANY, Respondent, et al., Defendant.

Fourth Department, April 8, 1959.

*Karz, Michaels & Buetens* (*Melvin Wm. Buetens* of counsel), for appellant.

*Oviatt, Gilman, O'Brien & Forman* (*Percival D. Oviatt, Jr.,* of counsel), for respondent.

HALPERN, J. On November 30, 1954, while the plaintiff was driving a truck manufactured by the defendant Ford Motor Company, he heard something snap in the internal mechanism and he found that the steering wheel spun freely in his hands and that he was unable to steer the truck. As a result, he could not turn to the right to follow a curve in the road; the truck continued straight ahead, crashed through several guardrails, went down an embankment and landed upside down in the bed of the Susquehanna River, which ran close to the road. The plaintiff was thrown through the windshield and suffered severe personal injuries. He brought an action against the Archer Motor Company, from which he had purchased the truck, and against the Ford Motor Company as the manufacturer. During the trial, the Archer Company settled the action against it for $1,500 and obtained from the plaintiff a covenant not to sue, reserving his rights against the manufacturer.

It was proved upon the trial that the plaintiff had ordered the truck from the Archer Company early in August, 1954, and after a delay of a few weeks, the Archer Company obtained the truck from the Ford Company and delivered it to the plaintiff on August 30, 1954. As delivered, the truck did not have a body on it. The plaintiff added a set of dual wheels and a third axle and had a body placed upon the truck by a body building company. This work consumed about 2 to 2½ weeks, so that the plaintiff began to operate the truck actively about the middle of September. From the beginning, he had trouble with the steering. When he tried to turn, the steering wheel would " bind " and the truck would pull to the right or left. There was a clinking noise in the steering box whenever the truck hit a rough spot in the road. The plaintiff immediately took the truck back to Archer's and complained of the steering trouble and he repeated the complaint upon three subsequent occasions. The Archer Company's mechanics examined the front end but could find nothing wrong; however, the vital part of the steer-

ing mechanism was enclosed in a sealed box which the mechanics did not open. The difficulty in steering continued right down to the day of the accident.

As explained upon the trial, the steering rod or column running from the steering wheel terminates in a worm gear which fits into the rotating gear of another steel rod, running at right angles, at the end of which there is attached a Pitman arm to which the tie rods and links leading to the front wheels are connected. This horizontal steel rod, known as the steering sector shaft, is enclosed in a sealed box, known as the steering sector box. The left hand side of the frame of the truck chassis forms the left side of the box. The steering sector shaft passes through a hole in the frame and protrudes beyond it a distance of about one inch. This end of the shaft is machined and the Pitman arm is attached to it.

It was found, upon examination of the truck, after the accident, that the steering sector shaft had broken in two at a point just beyond the frame and that the end fragment was still attached to the Pitman arm. A new steering sector was obtained and installed in the truck and there was no further difficulty in the steering of the truck. Up to the time of the trial, in 1957, the truck had been operated without further incident, for about 120,000 miles.

The broken parts were produced upon the trial and were introduced into evidence. There was expert testimony that the fracture was of the type known as a fatigue fracture and that it was the result of a shearing or twisting stress to which the steering sector shaft had been subjected in the course of use. It was reasonably inferable from the testimony that, if the parts had been properly made and installed, the shaft would not have been subjected to a stress of fracturing force. It was also reasonably inferable from the testimony that a misalignment or maladjustment of some kind in the assembly and installation of the parts caused the undue stress. But the plaintiff's witnesses were not able to state with definiteness the precise nature of the misalignment or maladjustment which gave rise to the extra strain.

At the conclusion of the plaintiff's case, the court granted the defendant's motion for a dismissal upon the ground that any verdict " would be based solely upon speculation, guess and surmise, as to how, or what caused the happening of the accident ".

In our view, the dismissal was erroneous. The trial court should have been " guided by the rule that the facts adduced at the trial are to be considered in the aspect most favorable to

plaintiffs and that plaintiffs are entitled to the benefit of every favorable inference which can reasonably be drawn from those facts '' (*Sagorsky* v. *Malyon,* 307 N. Y. 584, 586). Under this rule, the proof was, in our opinion, sufficient to make out a prima facie case.

The fact that the plaintiff's experts were not able to state the precise nature of the defect which resulted in the undue stress which, in turn, caused the fracture, did not render the plaintiff's proof insufficient as a matter of law. As we held in *Markel* v. *Spencer* (5 A D 2d 400, 408, affd. 5 N Y 2d 958) the plaintiff was not required '' in order to make out a prima facie case, to prove the exact nature of the defect which caused the bolt [shaft] to break ''. '' So long as the proof was sufficient reasonably to warrant an inference that there had been some negligence on the part of the manufacturer, with respect to the bolt [shaft], a prima facie case was made out ''.

Of course, this case differs on its facts from the *Markel* case; in some respects, the proof in this case is less favorable to the plaintiff than in the *Markel* case but, in other respects, it is more favorable. In the *Markel* case, the plaintiff rested upon an inference of negligence from circumstantial evidence, while in this case the plaintiff offered direct evidence supporting an inference of negligence. In the *Markel* case, the car had only been used three days and had only been driven 240 miles when the bolt broke. In this case, the truck had been driven 2½ months for a distance of about 9,000 miles before the fracture occurred. But the plaintiff in this case did not rely on inferences from the newness of the vehicle as the plaintiff had done in the *Markel* case. Here, there was direct evidence that the steering mechanism had not functioned properly from the beginning and that the '' binding '' effect continued right down to the time of the accident. Furthermore, there was expert testimony that the fracture was of a type known as a fatigue fracture and that it was caused by undue stress upon the steering sector shaft because of a maladjustment of some kind in the assembly of the mechanism. Since the steering sector box had been sealed at the factory and, since the proof showed that it had not been opened after it had left the factory, the jury would have been justified in inferring that the maladjustment was due to the negligence of the defendant manufacturer.

The defendant makes much of the point that substantial changes had been made in the vehicle after it had been acquired by the plaintiff. Of course, if it should be proved upon a retrial that the extending of the frame and the addition of the third axle and the extra wheels added to the strain upon the steering

mechanism and that these changes were, in part, responsible for the ultimate fracture, a different case would be presented but there is nothing in the present record which indicates that the enlargement of the truck had anything to do with the breakdown of the steering mechanism. All that we hold at this time is that the plaintiff had made out a prima facie case — that there was sufficient evidence of negligence to call upon the defendant to come forward with explanatory or exculpatory evidence, at the risk of the jury's drawing an inference of negligence from the plaintiff's proof, if the defendant failed to offer persuasive countervailing evidence.

The judgment and order appealed from should be reversed on the law and a new trial ordered, with costs to the appellant to abide the event.

All concur. Present — McCurn, P. J., Williams, Bastow, Goldman and Halpern, JJ.

Judgment and order reversed on the law and a new trial granted, with costs to the appellant to abide the event.